[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 18, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-16914

_____

D. C. Docket No. 07-00096-CV-BE-E

JENNIFER D. ALLEY,
REAL TIME MEDICAL DATA, LLC,

Plaintiffs-Appellees,

versus

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendant-Appellant,

AMERICAN MEDICAL ASSOCIATION,

Intervenor-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

(December 18, 2009)

Before CARNES, FAY and ALARCÓN,[*] Circuit Judges.

CARNES, Circuit Judge:

Even if history does not repeat itself, events do sometimes rhyme.[1] The

present national debate over health care rhymes a lot with one that took place three

decades ago.[2] And the sound of some of the arguments in this lawsuit echoes

---

[*] Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] This aphorism, or one like it, is often attributed to Mark Twain, although there is doubt about whether he is the author of it. See Lawrence P. Wilkins, Foreword, Symposium: Then, Now and into the Future: A Century of Legal Conflict and Development, 28 Ind. L. Rev. 135, 137 & n.4 (1995).

[2] The following description of the debate, written thirty-two years ago, could just as easily come from a recent newspaper or magazine:

> Heightened public concerns about the medical care system, in combination with Democratic domination of both the White House and Congress, make the enactment of some NHI [National Health Insurance] plan likely. Yet the entrenched coalitions and ideological commitments that have historically shaped social welfare policy will continue to influence the NHI debate. The old questions—whether more federal intervention is desirable, and whether it constrains or broadens individual choice—will again be raised.

M. Kenneth Bowler et al., The Political Economy of National Health Insurance, 2 J. Health Pol. Pol'y & L. 100, 129 (1977); see also Mark Schlesinger & Tae-Ku Lee, Is Health Care Different? Popular Support of Federal Health and Social Policies, 18 J. Health Pol. Pol'y & L. 551, 552–53 (1993) ("The early 1970s were a time of comparable interest in fundamental health financing reform, particularly in Washington. As Congress began its session in 1975, there were twenty-three national health insurance proposals pending before it. Popular support for a government-financed plan was high. . . . The same mix of concerns about costs and access to care characterized the political debates of this period." (citations omitted)); Jonathan Oberlander, Political Analysis and Medical Care: The Politics of Medicare Reconsidered, 26 J. Health Pol. Pol'y & L. 139, 140 (2001) ("The debate over national insurance from 1970 to 1975 brought health politics to national prominence, while mounting health care expenditures created the first (though certainly not the last) American 'cost crisis.'").

those heard in similar litigation that arose during the 1970s debate. That earlier litigation concerned a federal agency's intent to release records of government payments to Medicare providers; on privacy grounds, the providers persuaded a district court to enjoin the release of those records. While its meter might not match our own, that decades-old decision and the injunction issued control the closing couplet of this case.

## I.

The plaintiffs seek to compel the United States Department of Health and Human Services (HHS) to disclose certain records under the Freedom of Information Act, 5 U.S.C. § 552. HHS argues that complying with the plaintiffs' FOIA request would violate an injunction issued in Florida Medical Ass'n v. Department of Health Education & Welfare, 479 F. Supp. 1291 (M.D. Fla. 1979) ("FMA"). Under the rule of GTE Sylvania, Inc. v. Consumers Union of the United States, Inc., 445 U.S. 375, 384, 100 S. Ct. 1194, 1200 (1980), an agency that complies with a court order forbidding disclosure does not violate the FOIA. After dusting off the 1979 injunction from FMA, the district court construed it narrowly and decided that it does not cover the information the plaintiffs seek. If that were so, GTE Sylvania would not apply and the disclosure the district court ordered in this case might be required.

We believe, however, that the FMA injunction against disclosure does cover the information that the district court ordered HHS to disclose in this case. So long as that earlier injunction is in effect GTE Sylvania bars any court from ordering disclosure. While the plaintiffs are free to seek to have the old injunction modified or vacated, they may not do so collaterally in this case. That is the overview of the case and our decision. Now for the details.

**A.**

We will get to the procedural facts of this case shortly, but it is helpful to begin with an explanation of the FMA case, which resulted in the 1979 injunction. The story of that case starts in March 1977 when the Secretary of the United States Department of Health, Education and Welfare (HEW), the agency then responsible for administering Medicare, made public a list of the physicians and groups of physicians who in 1975 received $100,000.00 or more in reimbursements for providing Medicare services. FMA, 479 F. Supp. at 1297. The disclosure included the gross amount of reimbursements received by each provider. Id. The information was widely publicized in the news media, and "it was later determined that the information published was inaccurate in many ways." Id. In November 1977 the Secretary directed various carriers to prepare and publish another list, this time of all providers paid Medicare reimbursements in 1977. Id. "The list

4

was to include full names of the physicians and providers, their addresses, the net total amount of Medicare reimbursement paid [directly] . . . to each physician or provider, and the net total amount of Medicare reimbursements paid to beneficiaries for . . . services furnished by each physician or provider." Id.

The Secretary was determined to have HEW do its best to ensure the accuracy of the information, but physician providers were not mollified. See id. In March 1978 the Florida Medical Association and six individual physicians, on behalf of all Florida physicians whose patients were Medicare beneficiaries in 1977, brought a class action suit in the Middle District of Florida to enjoin the scheduled disclosures. See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare, 601 F.2d 199, 201 (5th Cir. 1979) (reviewing that procedural history in an otherwise unrelated appeal).

The American Medical Association, whose membership at the time exceeded 200,000 licensed physicians, was allowed to intervene as a plaintiff in June 1978. FMA, 479 F. Supp. at 1295. The court then recertified the class of plaintiffs to include all physicians licensed to practice in Florida and all members of the AMA, if they were providers of Medicare services and would be individually identified by the disclosure of annual Medicare reimbursement amounts. Id. at 1295–96.

5

The plaintiffs in that lawsuit claimed that the impending disclosures were not required by the FOIA and would violate the Privacy Act, 5 U.S.C. § 552a. They argued that various FOIA exemptions applied, the most important of which for present purposes is Exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6); see generally News-Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1190–91 (11th Cir. 2007).

The district court first decided that the information the Secretary intended to disclose qualified as "similar files" under Exemption 6. See FMA, 479 F. Supp. at 1303–04. It stated that "[c]ourts must look past mere appearances and beneath labels, to the actual character and nature of the information in question," id. (citing Dep't of Air Force v. Rose, 425 U.S. 352, 374, 96 S. Ct. 1592, 1605 (1976)), and explained that the statutory term "similar files" means those containing information of a "personal quality and nature," id. at 1304. The court reasoned that because personal financial information might cause embarrassment if publicly disclosed, the list of annual reimbursements to Medicare providers qualified as a "similar file" under Exemption 6. Id.

As required, the district court examined the competing public and private interests. It found, on the non-disclosure side of the scales, that the proposed

6

disclosure "surely" would invade the personal privacy of providers. Id. at 1304.

On the other side of the scales, the court recognized that the public unquestionably

had a "legitimate and important interest" in knowing the amount of public funds

spent in reimbursing Medicare providers annually, "especially in light of the

ongoing legislative debate over national health insurance." Id. What seemed to be

the decisive factor to the court was its complementary beliefs that no legitimate

public interest would be advanced "by revealing the identity of individual

providers and their annual reimbursement amounts" and that the public interest

goals the Secretary wanted to further could be satisfied by disclosures that avoided

"personally and individually identifying details." Id. at 1304–05.

Those beliefs led the court to conclude that the proposed disclosure, "at

least in the individually identifying manner" intended, was covered by Exemption

6. Id.; see also id. at 1311. Because the disclosure of information that falls within

the scope of Exemption 6 would violate the Privacy Act, the court decided that

"the release of such individually identifying information, without the 'prior written

consent' of those individually identified providers, is prohibited by the Privacy

Act." Id. at 1306–07; see also id. at 1311.

Putting a practical point on its decision, the court issued a permanent

injunction against the Secretary of HEW and her successors, the first paragraph of

which forbade them "from disclosing <u>any list</u> of annual Medicare reimbursements [sic] amounts, for <u>any years</u>, which would personally and individually identify those providers of services under the Medicare program who are members of the recertified class in this case." <u>Fla. Med. Ass'n, Inc. v. Dep't of Health, Educ. & Welfare</u>, No. 78-178-Civ-J-S, 1–2 (M.D. Fla. 1979) (emphasis added). The second paragraph of the injunction declared that: "<u>Any such disclosure</u> of annual Medicare reimbursement amounts, for <u>any years</u>, in a manner that would personally and individually identify the providers of services under the Medicare program who are members of the recertified class in this case is declared to be contrary to federal law." <u>Id.</u> at 2 (emphasis added).

## B.

A quarter of a century after that injunction issued, Jennifer Alley owned Real Time Medical Data, LLC, a business that uses Medicare claims data to assist hospitals and other clients with their marketing and strategic planning efforts. In 2003 she filed a FOIA request with the Department of Health and Human Services or HHS, the current name for the old HEW. Her request was for data on all Medicare claims paid in 2002 for procedures performed in Florida, Georgia, Mississippi, and Tennessee. She wanted Current Procedural Terminology (CPT) codes for each medical service and procedure for which Medicare had paid a

8

claim, as well as the providing physician's name and address.[3]  The agency denied

the request, and after exhausting her administrative remedies, Alley filed this

lawsuit in January 2007, seeking preliminary and permanent injunctive relief.[4]

HHS subsequently withdrew its FOIA decision and informed Alley that it

would provide her with some but not all of the data she requested.  It refused to

release any Medicare Part B outpatient claims data that "would, in combination

with readily available public information, lead to the disclosure of individual

physician reimbursement amounts."[5]  HHS later clarified that it would disclose the

requested Part B outpatient claims data in part, including the procedures paid on

each claim, but with two exclusions.  First, it would not release the names,

---

[3] Every medical product and service can be identified according to its standardized CPT
code.  Alley requested over a dozen elements of data for each claim—including the CPT code,
number of units per CPT code, beneficiary zip code, dates of service, place of service, and the
provider's name, address, city, and zip code.  Although Alley did not request a specific annual
reimbursement amount, as we will explain shortly, the information she requested would enable
her to identify the specific annual amount for each provider.

[4] Although Alley submitted the FOIA requests in this case, in her Amended Complaint
she also included her company, Real Time Medical Data, LLC, as a plaintiff.  We refer to the two
plaintiffs collectively as "Alley."

[5] The Medicare program is divided into two principal parts.  Part A provides
reimbursement for certain hospital stays, related services, and some outpatient clinical services.
See 42 U.S.C. §§ 1395c–1395i-5.  Part B offers coverage for medically necessary physician
services, outpatient care, and some other services not covered by Part A.  See id. §§
1395j–1395w-4.  HHS granted in full Alley's request for records on Medicare Part A outpatient
procedures.  It also agreed to Alley's request for data on inpatient procedures under both Part A
and Part B, with the exception of the patient control numbers that providers use to facilitate
retrieval of individual patient accounts.  The parts of Alley's requests that HHS granted are not
involved in this appeal.

9

addresses, and cities of individual physicians or small group practices containing only one or two physicians. Second, it would not disclose the zip codes of individual physicians or small group practices where fewer than five providers are located.[6] HHS defended those two exclusions as necessary to avoid a "clearly unwarranted invasion of personal privacy" under FOIA Exemption 6, and to avoid running afoul of the 1979 FMA decision. According to HHS, the full disclosure Alley sought would identify individual physicians, and anyone with that information could then calculate total annual Medicare payments for each physician; that could be readily done because the amounts paid for each CPT code are publically available in the Medicare physician fee schedule.

In May 2008 the district court issued a memorandum opinion granting Alley's motion for summary judgment in part.[7] See Alley v. Dep't of Health & Human Servs., No. 1:07-CV-00096-KOB, slip. op. at 33–34 (N.D. Ala. May 8,

---

[6] HHS withheld slightly more data for Florida (it did not release the name, address, or city of any group practice) than for the other three states, because it was not technically feasible to segregate the data as requested for Florida. That difference is immaterial to this appeal. See Alley v. Dep't of Health & Human Servs., No. 1:07-CV-00096-KOB, slip. op. at 9 (N.D. Ala. May 8, 2008).

[7] The district court denied both parties' motions for summary judgment on Alley's claim that HHS has a policy of denying FOIA requests that take two or more hours to process, and it granted leave for Alley to conduct limited discovery into that matter. The court granted summary judgment to HHS regarding Alley's separate claim involving her request for records of Medicare claims in Alabama because Alley had not exhausted her administrative remedies as to that claim. She did not file a cross-appeal of that decision.

2008).  The court concluded that the <u>FMA</u> injunction does not apply because Alley had requested "raw data" rather than actual annual Medicare reimbursement amounts, and because the <u>FMA</u> injunction should be construed narrowly.  The district court then weighed the "substantial public interest" in disclosure against the "very limited privacy interest" and found that disclosure would not constitute a clearly unwarranted invasion of privacy under Exemption 6.

Along with its opinion, the district court issued a permanent injunction against HHS.  That injunction not only orders disclosure of the requested 2002 Medicare claims data for Florida, Georgia, Mississippi, and Tennessee, but also enjoins HHS from refusing any future FOIA requests by Alley for the same type of data for "any year" or "any states," so long as she follows the proper administrative procedures.[8]

On the same day the court denied HHS's motion for reconsideration, it granted the AMA's motion to intervene.  Both the AMA and HHS appealed the district court's final judgment.

---

[8] HHS raises what it terms a "jurisdictional" argument, asserting that the district court's 2008 injunction is overbroad because it grants relief encompassing Medicare claims data for "any year" and "any states," even though Alley had not requested such relief.  Because we are vacating that injunction on other grounds, that issue is moot.

11

## II.

Our resolution of this case turns on the proper interpretation of the 1979

FMA injunction.[9]  This Court has not yet decided the standard of review that

applies in these circumstances.  We have held that in a direct appeal from an

injunction issued by a district court we will review the scope of it only for an

abuse of discretion.  Angel Flight of Ga., Inc. v. Angel Flight Am., Inc., 522 F.3d

1200, 1208 (11th Cir. 2008); CBS Broad., Inc. v. EchoStar Commc'ns Corp., 450

F.3d 505, 517 n.25 (11th Cir. 2006).  That would have been the applicable

standard in any direct appeal from the issuance of the FMA injunction by the

Middle District of Florida in 1979, but this is not a direct appeal of that old

injunction.  Instead, this appeal is from a judgment entered in the Northern District

of Alabama in 2008, based on that court's interpretation of the 1979 injunction.

We do review a district court's interpretation of its own orders only for an

abuse of discretion.  See Cave v. Singletary, 84 F.3d 1350, 1354–55 (11th Cir.

1996).  Although that standard of review carries over to the interpretation of

injunctions, see Williams v. City of Dothan, Ala., 818 F.2d 755, 760 (11th Cir.

_____

[9] In a nearly identical case the D.C. Circuit avoided interpreting the FMA injunction by holding that Exemption 6 of the FOIA applied regardless of whether the FMA injunction did. See Consumers' Checkbook, Ctr. for Study of Servs. v. U.S. Dep't of Health & Human Servs., 554 F.3d 1046, 1050 n.3 (D.C. Cir. 2009).  While we arrive at the same destination, we take the opposite route to get there.  Because we conclude that the FMA injunction bars disclosure of the requested data, we have no need to decide if Exemption 6 would prevent it.

1987) ("[G]reat deference is due the interpretation placed on the terms of an injunctive order by the court who issued and must enforce it." (quoting Ala. Nursing Home Ass'n v. Harris, 617 F.2d 385, 388 (5th Cir. 1980))),[10] it does not follow that the standard applies to one judge's interpretation of an injunction issued by another judge. In Cave we cited with favor the Seventh Circuit's explanation that "[t]he district court is in the best position to interpret its own orders." 84 F.3d at 1355 (quoting In re Chi., Rock Island & Pac. Ry. Co., 865 F.2d 807, 810–11 (7th Cir. 1988)). But any insider knowledge that a judge may have about her own orders would not extend to the orders of another judge. There is no reason to believe that a district court judge would have any advantage over the judges of this Court in interpreting an injunction issued by another district judge.

This case is a good example of that. The FMA injunction was authored and issued by Judge Scott in the Middle District of Florida thirty years ago, well before the district court judge in the Northern District of Alabama who was called upon to interpret that injunction (or the author of this opinion, for that matter) was on the bench. Any insider knowledge about the injunction was specific to Judge

---

[10] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Scott, who long ago called his last docket and went to his final judgment. We respect the views of the different district court judge in this case about what Judge Scott meant, but it is respect without deference. See Youakim v. McDonald, 71 F.3d 1274, 1282–83 (7th Cir. 1995) ("To the extent [the district court judge] interpreted the terms of the 1976 judgment, which was entered by a different district judge, we accord his interpretation no deference and review the requirements of that judgment de novo."); Schering Corp. v. Ill. Antibiotics Co., 62 F.3d 903, 908 (7th Cir. 1995) (same); see also Dominguez v. Tom James Co., 113 F.3d 1188, 1190 (11th Cir. 1997) ("[W]e review de novo . . . all questions of law.").

**III.**

The FOIA grants district courts jurisdiction "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). Before an injunction may issue the plaintiff must show that the agency has 1) improperly 2) withheld 3) agency records from her. GTE Sylvania, 445 U.S. at 384, 100 S. Ct. at 1200 (citing Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150, 100 S. Ct. 960, 968 (1980)); accord U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142, 109 S. Ct. 2841, 2846 (1989). "Judicial authority to

14

devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by § 552, if the agency has contravened all three components of this obligation." Kissinger, 445 U.S. at 150, 100 S. Ct. at 968; see also Tax Analysts, 492 U.S. at 142, 109 S. Ct. at 2846–47. It is undisputed in this case that the Medicare claims data are agency records within the meaning of the FOIA and that they have been withheld from Alley. The only dispute is about whether withholding those records was "improper."

In GTE Sylvania the Supreme Court held that an agency does not improperly withhold information when a federal district court has enjoined the agency from disclosing the information:

> There is nothing in the legislative history to suggest that in adopting the Freedom of Information Act to curb agency discretion to conceal information, Congress intended to require an agency to commit contempt of court in order to release documents. . . . To construe the lawful obedience of an injunction issued by a federal district court with jurisdiction to enter such a decree as "improperly" withholding documents under the Freedom of Information Act would do violence to the common understanding of the term "improperly" and would extend the Act well beyond the intent of Congress.

GTE Sylvania, 445 U.S. at 387, 100 S. Ct. at 1202. In so holding, the Court reiterated "the established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order." Id.

15

at 386, 100 S. Ct. at 1201 (citations omitted); accord Celotex Corp. v. Edwards, 514 U.S. 300, 306, 115 S. Ct. 1493, 1498 (1995); Fla. Ass'n for Retarded Citizens, Inc. v. Bush, 246 F.3d 1296, 1298 (11th Cir. 2001) ("Although not all injunctions operate in perpetuity, a district court should enforce an injunction until either the injunction expires by its terms or the court determines that the injunction should be modified or dissolved."); Citizens Concerned About Our Children v. Sch. Bd. of Broward County, Fla., 193 F.3d 1285, 1292 (11th Cir. 1999) (citing GTE Sylvania for the proposition that "the law considers an enjoined party to have lost the discretion to contravene a court order").

The reason the Supreme Court did not express any opinion on the soundness of the underlying injunction in GTE Sylvania is that it did not matter under the rule announced in that case whether the injunction prohibiting disclosure was unsound, unwise, or otherwise in need of being modified or vacated. It did not matter because GTE Sylvania was a FOIA case, not a proceeding to modify or vacate an injunction. The same is true of this case. Part and parcel of the GTE Sylvania decision is the principle that an injunction issued by one court against the disclosure of information may not be collaterally attacked in another court in a FOIA lawsuit seeking disclosure of that information. See GTE Sylvania, 445 U.S. at 386–87, 100 S. Ct. at 1201–02; see also Celotex, 514 U.S. at 313, 115 S. Ct. at

16

1501 ("[I]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected." (quotation marks and citation omitted)); Mann Mfg., Inc. v. Hortex, Inc., 439 F.2d 403, 407–08 (5th Cir. 1971) ("When a court is confronted with an action that would involve it in a serious interference with or usurpation of" another court's "continuing power to supervise and modify its injunctions," "considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction and remand the parties for their relief to the rendering court, so long as it is apparent that a remedy is available there." (quotation marks, ellipsis, and citation omitted)); Wagar v. U.S. Dep't of Justice, 846 F.2d 1040, 1047 (6th Cir. 1988) (rejecting an attempt by a party requesting documents under the FOIA to collaterally attack a consent order barring disclosure of the requested records, and noting that the appropriate forum in which to challenge the validity of the order is the district court that issued it); Lykins v. U.S. Dep't of Justice, 725 F.2d 1455, 1460–61 (D.C. Cir. 1984) ("[T]hose who object to a court order are expected to make their objection by means of the rules and procedures in accord with which the judicial system operates, for a court's ability to command

17

adherence to its procedures and to resolve disputes depends on its ability to compel obedience to orders properly issued.").

The rule that a FOIA lawsuit may not be used to collaterally attack an injunction prohibiting disclosure of certain records does not mean there is no remedy for the party seeking those records. It means that the party must first succeed in having the issuing court modify or vacate the injunction barring disclosure. If that court refuses, the party may appeal that refusal. A direct attack, instead of a collateral one, is the proper procedure. Celotex, 514 U.S. at 313, 115 S. Ct. at 1501; see Wagar, 846 F.2d at 1047; see generally F.R.C.P. 60(b)(5); Horne v. Flores, __ U.S. __, 129 S. Ct. 2579, 2593 (2009); Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush, 261 F.3d 1037, 1063–64 (11th Cir. 2001); Epic Metals Corp. v. Souliere, 181 F.3d 1280, 1283–84 (11th Cir. 1999).

An example of the proper procedure is what the government did in 1982 when it became concerned that the FMA injunction might interfere with some disclosures for law enforcement purposes that are expressly permitted under the Privacy Act, 5 U.S.C. § 552a(b)(7). The government moved the United States District Court for the Middle District of Florida to modify its injunction to make it clear that those disclosures were permitted, and the court did so. See Fla. Med. Ass'n, Inc. v. Dep't of Health & Human Servs., No. 78-178-Civ-J-S (M.D. Fla.

18

Dec. 2, 1982). Alley should have handled any complaints she had about the FMA injunction in the same way, by taking them to the same court.

The Supreme Court did specify in GTE Sylvania that the rule of that case is subject to exceptions when the issuing court lacked personal or subject matter jurisdiction or when the injunction had "only a frivolous pretense to validity" at the time it was issued. 445 U.S. at 386–87, 100 S. Ct. at 1201–02 (quoting Walker v. City of Birmingham, 388 U.S. 307, 315, 87 S. Ct. 1824, 1829 (1967)). No argument has been, or could be, made that the court that issued the FMA injunction lacked personal or subject matter jurisdiction or that the decision to issue the injunction was frivolous. Alley argues against the injunction, but not that it was frivolous for the court to enter it.

As a result, we take the FMA injunction as issued, and under GTE Sylvania HHS's refusal to disclose the requested records cannot be improper withholding under the FOIA, if the injunction applies to the records Alley requested. It is that last condition on which Alley focuses most of her argument and on which she prevailed in the district court. The district court held that the injunction should be read narrowly, and reading it that way, the court concluded that it did not cover the records Alley wants.

## IV.

## A.

The district court's reasoning in this case was animated by its observation that the raw data Alley requested does not "correlate exactly" with the already calculated, annual reimbursement totals that were going to be released in the FMA case before the injunction was issued.  That observation carries no persuasive punch, however, because the raw data could be readily used to calculate annual reimbursement amounts.  As the district court found,  "[a]nyone wishing to determine the amount of annual Medicare reimbursements paid to physicians" could do so by "tak[ing] the data provided, combin[ing] that data with other information available to the public, and perform[ing] a number of calculations."  No party disputes that finding, and it is not clearly erroneous.  In the computer age, calculations are easy.

To support a narrow reading of the FMA injunction, the district court relied on the rule we stated in Keener v. Convergys Corp. that "[i]njunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." 342 F.3d 1264, 1269 (11th Cir. 2003) (citations omitted).  That rule dovetails with the requirement of Federal Rule of Civil Procedure 65(d) that every injunction state in specific terms and reasonable detail the conduct that it restrains or

20

requires.  See generally Ala. Nursing Home Ass'n, 617 F.2d at 387–88 ("This requirement of specificity and reasonable detail, based in part on notions of basic fairness, ensures that individuals against whom an injunction is directed receive explicit notice of the precise conduct that is outlawed." (citations omitted)).  It is well-settled that a district court abuses its discretion when it drafts an injunction that is unnecessarily broad in scope.  See Keener, 342 F.3d at 1269.

That principle, however, is one that guides district courts in issuing injunctions and appellate courts in reviewing the validity of them.  That is not what the district court was, or this Court is, authorized to do in this proceeding.  This is not the time or place to review the wisdom of the FMA injunction, or whether it complies with Federal Rule of Civil Procedure 65(d), or to whittle down its reach if we think it should have been drafted more narrowly.  Cf. United States v. ITT Cont'l Baking Co., 420 U.S. 223, 237 n.9, 95 S. Ct. 926, 935 n.9 (1975) ("[M]odification might be appropriate, but modification disguised as construction was not." (citations omitted)).  Permitting those types of inquiries into the injunction would condone an impermissible collateral attack on it.  See Part III, supra.

Another problem with the district court's approach is that the narrowest conceivable interpretation of an injunction is not necessarily the correct one.

Otherwise an enjoined party could assert "an overly literal or hypertechnical reading" of an injunction in order to slip the restraints that it imposes on that party. See AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1548 n.89 (11th Cir. 1986) (citing McComb v. Jacksonville Paper Co., 336 U.S. 187, 192–93, 69 S. Ct. 497, 500 (1949)). In AmBrit we said, as an example, that it would be impermissible for the defendant to circumvent an injunction proscribing the sale of certain "five ounce chocolate covered ice cream bar[s]" by "selling a 4.9 ounce bar or a bar covered with artificial chocolate." Id. at 1547 & 1548 n.89.

Other appellate courts have also rejected overly narrow interpretations of injunctions. In Schering, the Seventh Circuit rebuffed a veterinarian's attempt to circumvent an injunction barring him from selling an antibiotic "solution" by selling it in powdered rather than liquid form. 62 F.3d at 905–07. The court held that a "literal change in form" would not free the defendant from contempt. Id. at 907. In Christie Industries, an injunction expressly barring the defendant from shipping "firecracker assembly-kits" was construed by the Third Circuit to prohibit the "separate shipment of components in two or more packages . . . even though neither separate package would have been in violation." United States v. Christie Indus., Inc., 465 F.2d 1002, 1006–07 (3d Cir. 1972).

Suppose a court enjoins an agency from releasing annual data tied to identified providers.  The agency complies with that literal command but achieves the same end by releasing monthly data for each of the twelve months of the year for each provider without totaling it.  In a narrow literal sense, the agency would not have disclosed "annual" data.  But any reasonable interpretation of the injunction would lead to the conclusion that the agency had violated the injunction by releasing all the private information necessary to calculate annual totals.  Similarly, while Alley is not requesting annual or even monthly reimbursement totals, the data that she is requesting can readily be used to calculate those totals.  Disclosure of that data would put HHS in jeopardy of being held in contempt.

As the Seventh Circuit has put it:

> We have no quarrel with the general rule that injunctions should be construed narrowly in order to make sure that the persons subject to an injunction have clear notice of what they are prohibited from doing.  We intend no departure from the rule.  But like most legal rules, the rule of strict construction of injunctions should not be pressed to a dryly logical extreme.  If narrow literalism is the rule of interpretation, injunctions will spring loopholes, and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug the loopholes.  It is enough protection for defendants if close questions of interpretation are resolved in the defendant's favor in order to prevent unfair surprise.

Schering, 62 F.3d at 906 (citations omitted).  That approach is consistent with the law of this Circuit.  See Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d

1188, 1203 (11th Cir. 2001); Williams, 818 F.2d at 761; Combs v. Ryan's Coal Co., 785 F.2d 970, 978–79 (11th Cir. 1986).

One illustrative case from this Circuit is Abbott Laboratories, in which the district court had entered a consent judgment enjoining the defendant's sale, advertisement, or promotion of "Naturalyte" in square-shaped bottles that were confusingly similar to those used for the plaintiff's product. See Abbott Labs. v. Unlimited Beverages, Inc., 218 F.3d 1238, 1240 (11th Cir. 2000). Presumably after its lawyers had a spark of creativity, the defendant began selling the same solution in the same bottles to a third-party, who put its own label with a different name on the product. Id. The court's order had not specifically enjoined that arrangement, but we still affirmed the district court's imposition of civil contempt sanctions, holding that "[a] consent judgment need not recite every possible way in which a violation might occur when the proscribed conduct is readily ascertainable to an ordinary person." Id. at 1241. The context of the proceedings and the "common sense meaning of the documents" led us to conclude that it was not unfair surprise to find the defendant in contempt. Id.

Similarly, if it would be readily ascertainable to an ordinary person that HHS would violate the FMA injunction if it disclosed the data Alley seeks, then HHS is barred from doing it, even though the injunction does not recite in precise

24

detail the particular way in which the forbidden end would be brought about.  Id.

Although "we will construe any ambiguities or uncertainties in such a court order

in a light favorable to the person charged with contempt," Ga. Power Co. v.

N.L.R.B., 484 F.3d 1288, 1291 (11th Cir. 2007) (citation omitted), that "is not to

say that where an injunction does give fair warning of the acts that it forbids, it can

be avoided on merely technical grounds."  Christie, 465 F.2d at 1007.  HHS

certainly could not claim to be surprised that the injunction covers the data Alley

requested—could not contend that the injunction failed to give fair warning—

because HHS asserted the injunction as a reason for not disclosing that data to her.

**B.**

Having rejected an overly narrow interpretation of the injunction, we focus

now on the fair meaning of its text.  See Abbott Labs., 218 F.3d at 1241–42.  The

text of an injunction is "subject to reasonable interpretation," though it "may not

be expanded beyond the meaning of its terms absent notice and an opportunity to

be heard."  Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1296 (11th Cir. 2002)

(citations omitted); see also Ala. Nursing Home Ass'n, 617 F.2d at 388 ("In

determining whether a particular act falls within the scope of an injunction's

prohibition, particular emphasis must be given to the express terms of the order.

25

An injunction does not prohibit those acts that are not within its terms as reasonably construed." (citation omitted)).

The language of the FMA injunction is broad. It permanently enjoins disclosure of "any list" of annual Medicare reimbursement amounts, "for any years," if disclosing it would identify members of the recertified class.[11] The declaration paragraph of the injunction declares contrary to federal law "[a]ny such disclosure" of annual Medicare reimbursement amounts "in a manner that would personally and individually identify the providers of services." The repeated use of the word "any" makes clear that the scope of the injunction is not limited to the precise method of disclosure that was proposed in 1977. The adjective "any" has an expansive meaning and refers to "every" or "all" of the subject that it is describing. See CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001) (collecting cases). We recognize that "such" can be a word of limitation, but the weight of the repeated use of the word "any" tips the balance of meaning the other way.

The finding by the district court that the data Alley has requested could be used to calculate the same information that the FMA injunction forbids HHS from

---

[11] The recertified class includes, for purposes of this case, present-day providers who are licensed to practice in Florida and those who are members of the AMA in the four states relevant to Alley's FOIA request.

disclosing should have been the end of the matter. It means that HHS would be "disclosing" annual Medicare reimbursement amounts, as prohibited by the FMA injunction, if it were to comply with Alley's FOIA request. The plain meaning of "disclose" is to reveal something previously unknown or make it known. See Random House Webster's Unabridged Dictionary 562 (2d ed. 1998) (defining "disclose" as: "1. to make known; reveal or uncover: to disclose a secret. 2. to cause to appear; allow to be seen; lay open to view"); see also Black's Law Dictionary 497 (8th ed. 2007) (defining "disclosure" as "[t]he act or process of making known something that was previously unknown; a revelation of facts"); Webster's Third New International Dictionary 645 (1986) (defining "disclosure" as "the act or an instance of opening up to view, knowledge, or comprehension").

Although in some cases it is speculative whether the disclosure of one fact would reveal, or make known, another one, we need not speculate here. If the requested records are disclosed, the public would possess all the previously unknown data that is necessary to reveal or make known the annual reimbursement totals. As the Supreme Court has acknowledged, at least implicitly, such "indirect" disclosures are disclosures nonetheless. See C.I.A. v. Sims, 471 U.S. 159, 179–80, 105 S. Ct. 1881, 1893 (1985) (finding support in the record for the claim that disclosure under the FOIA of the institutional affiliations

27

of researchers on a CIA-funded project might lead to the "indirect disclosure" of individual researchers because knowledgeable observers could "deduce the identities" of protected intelligence sources).

Even though Alley has requested data on procedures for which Medicare reimbursed physicians, while the FMA injunction bars disclosure of reimbursement amounts, disclosing the former is tantamount to disclosing the latter. Information on Medicare procedures, in combination with publically available data on the cost of those procedures, would reveal or make known the total amounts that identifiable physicians were reimbursed annually.

## C.

What the plain text of the FMA injunction indicates, the context in which that language was written reinforces; much of that context is provided in the opinion issued in tandem with the injunction. See Haskell v. Kan. Natural Gas Co., 224 U.S. 217, 223, 32 S. Ct. 442, 444 (1912) ("[T]he decree must be read in view of the issues made and the relief sought and granted."); Consumers' Checkbook, 554 F.3d at 1064 (Rogers, J., concurring in part and dissenting in part); Youakim, 71 F.3d at 1283 ("[T]he terms of an injunction, like any other disputed writing, must be construed in their proper context."); Christie Indus., 465 F.2d at 1007 ("The language of an injunction must be read in the light of the

28

circumstances surrounding its entry:  the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." (citations omitted)).[12]

The opening paragraph of the <u>FMA</u> opinion describes the issue presented as "whether the Secretary [of HEW] may disclose information <u>concerning</u> the annual amounts of reimbursements paid to Medicare providers in a way that would individually identify as least some of those providers."  <u>FMA</u>, 479 F. Supp. at 1294 (emphasis added).  The opinion emphasizes the "individually identifying" nature of the information, not whether reimbursement amounts happened to be already calculated.  <u>See, e.g.</u>, <u>id.</u> at 1299 n.7 ("Any other body of information which the government proposed to disclose in an individually-identifying way, without the affected individuals' prior consent, would precipitate the same privacy interest that plaintiffs assert.").  Interpreting Exemption 6 of the FOIA, the <u>FMA</u> opinion notes that "the term 'similar files' should be given a broad interpretive scope in order to protect the persons for whom it was designed."  <u>Id.</u> at 1303.

---

[12] Although the parties to an injunction "must be able to ascertain from the four corners of the order precisely what acts are forbidden," <u>Planetary Motion</u>, 261 F.3d at 1203 (quotation marks and citation omitted), that rule does not preclude an examination of context.  <u>Cf.</u> <u>ITT Cont'l Baking Co.</u>, 420 U.S. at 238, 95 S. Ct. at 935 (noting that an examination of "the circumstances surrounding the formation of the consent order . . . does not in any way depart from the 'four corners' rule"); <u>Riccard</u>, 307 F.3d at 1297 ("Context is often important to meaning, and so it is here."); <u>Abbott Labs.</u>, 218 F.3d at 1240–41 ("[T]he consent judgment is to be read in the light of the circumstances surrounding its formation . . . ." (citation omitted)).

Finally, it concludes that the list at issue is a "similar file" under Exemption 6, observing that "[c]ourts must look past mere appearances and beneath labels, to the actual character and nature of the information in question." Id. (citation omitted).

Attempting to turn a strike against her into a hit in her favor, Alley makes three arguments for why the context of the FMA injunction indicates that it does not cover the subject matter of her FOIA request. First, she asserts that the plaintiff class in FMA had only sought to enjoin "HEW's practice of voluntarily publishing to the general public an annual list identifying individual Medicare providers and the amount of Medicare reimbursements paid to them under the statutory Medicare reimbursal [sic] plan as it existed in 1979." Appellee Br. at 15 (emphasis in original). That claim is contradicted by the plain language of the injunction itself, which expressly covers the disclosure of "any list . . . for any years," not only the particular disclosure that had been proposed in 1977. Context cannot conquer plain language.

Second, Alley characterizes the FMA injunction as designed only to stop "gratuitous" disclosures that were "voluntarily" made by HEW. Again, the plain language of the injunction belies that assertion. The FMA court enjoined HEW "from disclosing" Medicare reimbursement amounts. Just as that language does

30

not distinguish between direct and indirect disclosures, it also does not treat "voluntary" disclosures differently from "involuntary" ones.

Third, Alley argues that the context has changed, that the rationale for the FMA injunction became obsolete when Congress passed the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106, which altered the Medicare reimbursement scheme. That alteration, which became effective in 1992, required HHS to transition from the "usual, customary, and reasonable" charge system, see 42 U.S.C. § 1395u(b)(3) (1976), to a Medicare reimbursement scheme using the Resource-Based Relative Value Schedule, a fee schedule for physicians' services, see § 6102, 103 Stat. at 2169–84 (codified at 42 U.S.C. § 1395w-4(a)). See generally Am. Acad. of Ophthalmology, Inc. v. Sullivan, 998 F.2d 377, 379 (6th Cir. 1993). Alley argues that physicians' privacy interests were much stronger in 1979 than they are today, because physicians have lost the "considerable discretion" they had to set their fees under the old reimbursement system. Disclosure of reimbursement amounts in 1979, according to Alley, would have "revealed to the public at large just how much their neighborhood doctors were secretly deciding to charge the federal government." Appellee Br. at 15. The AMA contests that characterization of the previous Medicare payment system, but we need not resolve that issue, because the FMA injunction simply is not

31

limited to reimbursement amounts under the old payment system. It plainly bars disclosure of "Medicare reimbursement amounts," without any qualification regarding the methodology used in setting those amounts.

Moreover, Alley's argument is precisely the type of collateral attack on the FMA injunction that we cannot permit, for reasons we have already discussed. See Part III, supra. Maybe the rationale behind that injunction has faded enough with time that it should be modified or vacated. Maybe not. Perhaps, as Alley also contends, a "fundamental shift in Medicare's purpose, as well as dramatic increases in the number of Medicare participants," have bolstered the public interests favoring disclosure. Perhaps not. If Alley wants to raise those issues, she can do so before the United States District Court for the Middle District of Florida in a proceeding to alter or vacate the injunction; we will not decide those issues here.

## V.

Because the FMA injunction, reasonably construed, covers the subject matter of Alley's FOIA request, we conclude that HHS did not "improperly" withhold those records under the FOIA.[13]  GTE Sylvania, 445 U.S. at 385–87, 100

---

[13] We recognize that HHS has refused to disclose records identifying any individual physician's reimbursement amounts, even though the FMA injunction only covers those physicians who are licensed to practice in Florida or who are members of the AMA. See FMA,

S. Ct. at 1201–02.  If Alley believes the FMA injunction is invalid, overly broad, or outdated, she can challenge it in the Middle District of Florida after joining all necessary parties.  If dissatisfied with that court's ultimate decision, she can appeal it to this Court.  We will not speculate about the outcome of such a proceeding or appeal, but we do reject Alley's attempt to collaterally attack the Middle District of Florida's FMA injunction in this Northern District of Alabama FOIA lawsuit.

The judgment of the district court is VACATED.  The case is REMANDED for proceedings consistent with this opinion.

---

479 F. Supp. at 1295–96.  Under the FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b) (sentence following the exemptions); see Miccosukee Tribe of Indians of Fla. v. United States, 516 F.3d 1235, 1257 (11th Cir. 2008).  It is possible that records pertaining to non-AMA physicians from Georgia, Mississippi, and Tennessee (assuming they are not licensed in Florida) are "reasonably segregable" from those records covered by the FMA injunction.  We leave open that issue, which we do not need to decide in this appeal.