**EFiled: May 03 2017 03:12PM EDT**
**Transaction ID 60551802**
**Case No. 12648-VCS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

EMSI ACQUISITION, INC.,        :
       :
          Plaintiff,        :
       :
          v.        :     **C.A. No. 12648-VCS**
       :
CONTRARIAN FUNDS, LLC, PACIFIC        :
LIFE INSURANCE COMPANY, PACIFIC        :
LIFE & ANNUITY COMPANY,        :
RELIASTAR LIFE INSURANCE        :
COMPANY OF NEW YORK, MMD        :
RESOURCES, LLP, MARK S. DAVIS        :
(individually and in his capacity as        :
guarantor of MMD RESOURCES, LLP),        :
and ROBERT P. BROOK,        :
       :
          Defendants.        :

## MEMORANDUM OPINION

Date Submitted: February 7, 2017
Date Decided: May 3, 2017

S. Mark Hurd, Esquire, Ryan D. Stottman, Esquire, and Lauren K. Neal, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Stephen C. Hackney, Esquire and Timothy Knapp, Esquire of Kirkland & Ellis LLP, Chicago, Illinois, Attorneys for Plaintiff.

Rolin P. Bissell, Esquire and Paul J. Loughman, Esquire of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware and Marshall R. King, Esquire, Lauren M.L. Nagin, Esquire, Gabriel K. Gillett, Esquire of Gibson, Dunn & Crutcher LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiff, EMSI Acquisition, Inc. ("Plaintiff" or "Buyer"), brings this action against Defendants, Contrarian Funds, LLC, Pacific Life Insurance Company, Pacific Life & Annuity Company, Reliastar Life Insurance Company, Reliastar Life Insurance Company of New York, MMD Resources, LLP, Mark S. Davis, and Robert P. Brook (together, "Defendants" or "Sellers") to assert post-closing claims for indemnification following Plaintiff's acquisition of EMSI Holding Company ("EMSI" or the "Company") from the Defendants (the "Acquisition"). The Acquisition was memorialized in a Stock Purchase Agreement (the "SPA") which is at the heart of this dispute. It is alleged that EMSI manipulated its financial statements prior to the Acquisition in order to inflate its EBITDA and induce Plaintiff to pay substantially more for the Company than it was worth. At issue is whether Plaintiff may avoid contractual limits on recovery for indemnification claims against the Sellers when the claims are based on fraudulent representations in the SPA made by the Company. Also at issue is whether findings of an independent auditor who attempted to resolve the dispute between the parties post-closing may be "confirmed" by the Court under the Delaware Arbitration Act.

Plaintiff asserts two counts in a Verified Complaint (the "Complaint") against Defendants: Count I for indemnification and Count II for confirmation of the auditor's award. Defendants have moved to dismiss both counts for failure to state a claim pursuant to Court of Chancery Rule 12(b)(6). For the reasons that follow,

1

I find that the SPA is ambiguous with respect to whether the Buyer's indemnification claims against the Sellers for allegedly fraudulent contractual representations of the Company in the SPA are subject to contractual limitations on indemnification claims. Extrinsic evidence is required to interpret the relevant provisions. Accordingly, the motion to dismiss Count I is DENIED. The motion to dismiss Count II, however, must be GRANTED as the auditor's findings do not constitute an arbitration award that is subject to "confirmation" under the Delaware Arbitration Act.

## I. BACKGROUND

In considering Defendants' motion to dismiss, I have drawn the facts from the well-pled allegations in the Complaint, documents integral to the Complaint and matters of which I may take judicial notice.[1] At this stage of the proceedings, all well-pled facts contained in the Complaint are assumed to be true.

### A. The Parties and Relevant Non-Parties

Plaintiff, EMSI Acquisition, Inc., an affiliate of private equity firm Beecken Petty O'Keefe & Company, is the Buyer under the SPA. It is a Delaware corporation with its corporate headquarters in Irving, Texas.

---

[1] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("A judge may consider documents outside of the pleadings only when (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.") (internal quotation marks and citation omitted).

As noted, each of the Defendants named in the Complaint are alleged to be Sellers under the SPA. Defendant, Contrarian Funds, LLC, is a Delaware LLC with its principal place of business in Greenwich, Connecticut. Defendant, Pacific Life Insurance Company, is a Nebraska insurance company with its principal place of business in Newport Beach, California. Defendant, Pacific Life & Annuity Company, is an Arizona insurance company with its principal place of business in Newport Beach, California. Defendant, Reliastar Life Insurance Company, is a Minnesota insurance corporation with its principal place of business in Minneapolis, Minnesota. Defendant, Reliastar Life Insurance Company of New York, is a New York insurance company with its principal place of business in Woodbury, New York. And Defendant, MMD Resources, LLP, is an Arizona limited partnership with its principal place of business in Scottsdale, Arizona.

Defendant, Mark S. Davis, is a former officer and shareholder of EMSI and a guarantor of MMD Resources, LLP's obligations under the SPA. He is named in the Complaint both in his individual capacity and as guarantor. Defendant, Robert P. Brook, is a former officer in EMSI's Healthcare Services division and a former shareholder of EMSI.

Non-party, EMSI Holding Company, is a medical information services company which, "[a]mong other things, [] collects and codes medical records, performs in-home health assessments, and supports clinical trials and drug-testing

3

specimen collections."[2]  At the time of the Acquisition, EMSI's three main business units were Healthcare Services, Insurance Services, and Investigative Services.  The Healthcare Services unit offers risk adjustment services to health plans and aids employers in drug and alcohol testing and identity verification.  The Insurance Services unit aids life insurers with underwriting requirements and electronic application processing services.  The Investigative Services segment offers investigative services to property, casualty and life insurance carriers.

## B.  EMSI Engages in a Sales Process

Defendants received their equity in EMSI through an out-of-court restructuring in 2005, and soon afterwards began attempting to sell their interests in the Company.  This included formal sales processes in 2009 and 2012—neither of which resulted in a sale.  In 2015, Defendants again decided to explore a sale of their equity in EMSI, beginning the sales process with the release of a Confidential Information Memorandum (the "CIM") on April 30, 2015.  The CIM projected a rosy outlook for EMSI's future, even though this was out of line with historical trends including a decline in profitability for the most recent fiscal year.

Plaintiff responded to the CIM in the summer of 2015 and the parties negotiated the Acquisition from July through November 2015.  Throughout these

---

[2] Verified Compl. ("Compl.") ¶ 21.

4

negotiations, the Defendants sent interim financial projections that forecast "significant near-term growth potential."[3] Plaintiff ultimately used the reported EBITDA of $10.2 million for the trailing twelve months to price the Acquisition. Based on this reported EBITDA, Plaintiff agreed to purchase EMSI on November 3, 2015 for $85 million.

## C. The Relevant Provisions of the SPA

The SPA recognized the distinction between the Sellers and the Company.[4] This distinction made sense given that, other than Davis and Brook, who were both Sellers and members of Company management, the other Sellers were stockholders who had received their equity in the Company through a restructuring. Based on the allegations in the Complaint, there is no indication that the "Institutional Sellers" (meaning those other than Davis and Brook) were at all involved in the management of the Company.

The structure of the SPA is familiar to those who regularly encounter such agreements. Article I outlined the transaction and set the purchase price: $85 million with certain contemplated adjustments. Importantly, Article I also identified an

---

[3] Compl. ¶ 28.

[4] The SPA defines the "Sellers" as Contrarian Funds, LLC, Pacific Life Insurance Company, Pacific Life & Annuity Company, Reliastar Life Insurance Company, Reliastar Life Insurance Company of New York, Mark S. Davis (both individually and on behalf of MMD Resources, LLP), and Robert P Brook. *See* Transmittal Aff. of Lauren K. Neal in Supp. of Pl.'s Br. in Opp. to Defs.' Mot. to Dismiss Ex. A ("SPA") Preamble.

5

adjustment for an "Escrow Amount," $9,562,500, which is a feature of the parties' agreed-upon indemnification scheme.[5] Article II outlined a post-closing purchase price adjustment procedure that included, *inter alia*, a process whereby the parties would "jointly engage [a] Settlement Auditor" to resolve disputes regarding Net Working Capital and other identified purchase price adjustments.[6] Any purchase price adjustments determined to be due the Buyer were to be paid out of the Escrow Funds and, "for the avoidance of doubt," the SPA made clear that "to the extent the then-remaining Escrow Funds are insufficient to pay the full amount of any such deficiency, no Seller (or other Escrow Payee) will have any liability to Buyer for such deficiency."[7]

Article III set forth each of the Seller's representations and warranties to the Buyer. They are noticeably more limited than those provided by the Company in Article IV. Here again, this is not surprising given that the Institutional Sellers were investors in, not managers of, the Company. Article III closes with the following language:

---

[5] SPA § 1.4(a).

[6] SPA § 2.3.

[7] SPA § 2.4(b).

6

NO ADDITIONAL REPRESENTATIONS OR WARRANTIES. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE TRANSACTION DOCUMENTS, SUCH SELLERS EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE, OR QUALITY OF THE COMMON SHARES OR THE BUSINESS OR THE ASSETS OR THE OPERATIONS OF THE EMSI ENTITIES OR ANY OTHER MATTER, AND SUCH SELLER SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE SUITABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE COMMON SHARES, THE BUSINESS, SUCH ASSETS, SUCH OPERATIONS, OR ANY PART THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, IT BEING UNDERSTOOD THAT THE COMMON SHARES, THE BUSINESS, SUCH ASSETS AND SUCH OPERATIONS ARE ACQUIRED, REDEEMED, OR TERMINATED, AS APPLICABLE, 'AS IS, WHERE IS' ON THE CLOSING DATE, AND IN THEIR PRESENT CONDITION.[8]

Article IV contains the Company's more expansive set of representations and warranties, several of which are at issue here. These included representations that the "unaudited consolidated balance sheets, statement of operations, and cash flows of the EMSI Entities for the six-month period ended September 30, 2015 . . . have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby";[9] that there had been no "change[] in any significant respect in any business practice" from March 31, 2015 to the close of the

---

[8] SPA § 3.9.

[9] SPA §§ 4.17(a)(ii), 4.17(b).

7

Acquisition;[10] that there had been no "change in the method of accounting or cash management practices" from March 31, 2015 to the close of the Acquisition;[11] that there had been no "accelerat[ion of] the collection of or discount[ing of] any accounts receivable";[12] that there had been no "action or fail[ure] to take any action that has had, or could reasonably be expected to have, the effect of accelerating to pre-Closing periods sales to customers or others that would otherwise be expected to occur after the Closing";[13] that there had been no agreements to change either the Company's business practices or accounting methods from the time period from March 31, 2015 and the close of the Acquisition;[14] that there had been no "Company Material Adverse Effect" since March 31, 2015;[15] and that the Company Disclosure Schedule incorporated within the SPA "contains true and complete copies" of the interim financial statements.[16]

---

[10] SPA §§ 4.9(a)(i), 4.17(a)(i).

[11] SPA § 4.9(a)(viii).

[12] SPA § 4.9(a)(xi).

[13] SPA § 4.9(a)(xiv).

[14] SPA § 4.9(a)(xvii).

[15] SPA § 4.9(c). "Company Material Adverse Effect" means, with certain designated exceptions, "any development, circumstance, change, event or condition that, individually or in the aggregate, has had or is reasonably likely to have a materially adverse effect on the business of the EMSI Entities, taken as a whole . . ." SPA Article XI.

[16] SPA § 4.17(a)(ii).

Article IV closes with a disclaimer nearly identical to the disclaimer in Article III:

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE TRANSACTION DOCUMENTS, THE COMPANY EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE, OR QUALITY OF THE COMMON SHARES OR THE BUSINESS OR THE ASSETS OR THE OPERATIONS OF THE EMSI ENTITIES OR ANY OTHER MATTER, AND THE COMPANY SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE SUITABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE COMMON SHARES, THE BUSINESS, SUCH ASSETS, SUCH OPERATIONS, OR ANY PART THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, IT BEING UNDERSTOOD THAT THE COMMON SHARES, THE BUSINESS, SUCH ASSETS AND SUCH OPERATIONS ARE ACQUIRED, REDEEMED, OR TERMINATED, AS APPLICABLE, 'AS IS, WHERE IS' ON THE CLOSING DATE, AND IN THEIR PRESENT CONDITION, AND THAT BUYER SHALL RELY ON ITS OWN EXAMINATION AND INVESTIGATION THEREOF.[17]

As an accent to the disclaimers, in Article V, the Buyer represented that it was only relying on the promises and representations contained in the SPA in a straightforward non-reliance clause:

The Buyer acknowledges that the representations and warranties of the Company and Sellers expressly contained in this Agreement constitute the sole and exclusive representations and warranties of the Company and Sellers to Buyer in connection with the Transaction Documents and the transactions contemplated thereby. Buyer acknowledges that any financial projections or other forward-looking statements provided by the EMSI Entities are for illustrative purposes only and are not and will not be deemed to be relied upon by Buyer in executing, delivering the

---

[17] SPA § 4.26.

9

Transaction Documents and performing the transactions contemplated thereby. Notwithstanding the foregoing, nothing in this Section 5.7 shall limit the right of Buyer to rely on the representations and warranties, covenants and agreements set forth in this Agreement or in any Schedule or Exhibit (or in any certificate delivered with respect thereto hereunder) or Buyer's right to indemnification hereunder.[18]

The parties also negotiated a comprehensive indemnification regime within Article X of the SPA. The Seller's indemnification obligations are set forth in Section 10.2:

> Subject to the other provisions of this Article X, (including, without limitation, Section 10.4), each Seller shall . . . indemnify and hold harmless . . . the "Buyer Indemnified Parties" [of which Plaintiff is a member] . . . from any and all Losses which any of the Buyer Indemnified Parties may sustain arising out of: (a) any breach of any representation or warranty of such Seller or the Company contained in this Agreement; (b) any breach of any covenant or agreement of such Seller that is contained in this Agreement . . .[19]

The limits upon Seller's indemnification obligations are provided in Section 10.4:

> Notwithstanding anything to the contrary in this Agreement (including, without limitation, Section 10.2) . . . : **(b)** The Buyer Indemnified Parties shall not be entitled to indemnification under Section 10.2(a) for any and all Losses unless and until the aggregate amount of all of the Losses . . . for which the Buyer Indemnified Parties would otherwise be entitled to indemnification pursuant to Section 10.2(a) exceed $450,000 (the "Basket Amount"), in which event, subject to the terms of this Article X and the Escrow Agreement, the Buyer Indemnified Parties will be entitled to be indemnified in accordance with Section 10.2(a)

---

[18] SPA § 5.7.

[19] SPA § 10.2.

for such Losses . . . in excess of the Basket Amount to the extent of, and exclusively from, any then-remaining Escrow Funds.[20]

Section 10.4(d) further limits Seller's indemnification liability to the amount of the set-aside Escrow Funds by providing that, "[n]otwithstanding anything to the contrary in this Agreement":

> The Buyer Indemnified Parties shall only be entitled to indemnification (i) with respect to Losses in respect of the representations and warranties (other than the Excluded Representations and the Specific Indemnity Items) to the extent of, and exclusively from, any then-remaining Escrow Funds . . .[21]

Section 10.10(a) makes clear that indemnification is the exclusive remedy for a Seller's breach of a representation, warranty or covenant:

> From and after Closing (except . . . in the case of claims for fraud or willful or intentional misrepresentation), the sole and exclusive remedy of the Seller Indemnified Parties and the Buyer Indemnified Parties for any breach or inaccuracy, or alleged breach or inaccuracy, of any representation, warranty or covenant under, or for any other claims arising in connection with, any of the Transaction Documents, other than specific performance, shall be indemnification in accordance with this Article X, subject to the limitations set forth herein . . .[22]

Section 10.10(b) of the SPA then appears to carve out from this limitation "any" claim "based upon fraud":

---

[20] SPA § 10.4(b).

[21] SPA § 10.4(d).

[22] SPA § 10.10(a).

11

Notwithstanding anything in this Agreement to the contrary (including . . . any limitations on remedies or recoveries . . .) nothing in this Agreement (or elsewhere) shall limit or restrict (i) any Indemnified Party's rights or ability to maintain or recover any amounts in connection with any action or claim based upon fraud in connection with the transactions contemplated hereby . . .[23]

### D. Plaintiff Discovers Fraudulent Misrepresentations in EMSI's Financial Statements and Related SPA Reps and Warranties After Closing

EMSI's financial performance dramatically declined after the close of the Acquisition, in contrast to the bright future for the Company the Defendants had forecast throughout the sales process.[24] This prompted Plaintiff to conduct a forensic investigation which revealed "a Company that was ready to implode because of months of financial manipulation, acceleration of revenue, and recognition of sham revenue and earnings."[25] Plaintiff alleges specifically that the financial fraud was implemented through manipulation of the Company's work in progress ("WIP") model by inflating volume and prices, accelerating revenue recognition for projects the Company was not yet working on, overstating assumptions about what percentage of contracts would be completed and falsifying its progress on ongoing projects.

---

[23] SPA § 10.10(b).

[24] Compl. ¶¶ 2–11, 161–73.

[25] Compl. ¶ 175.

As alleged in the Complaint, the Company's employees knowingly engaged in the scheme to manipulate the WIP in the ramp up to sell the Company. In June 2015, the Controller, the Executive Vice President of the Healthcare Division and the Division Controller for the Healthcare Division emailed EMSI employees about millions of dollars in WIP revenue that needed to be written off the financial statements. As instructed, EMSI employees thereafter created a new version of the Company's financials that wrote off substantial WIP. During the diligence process, however, EMSI accounting and operations employees reinstated this revenue on the books without explanation or disclosure to the Buyer. EMSI's Division Controller for the Healthcare Division was repeatedly told by the Executive Vice President of the Healthcare Division manually to override parts of the WIP model so that revenue recognition would be accelerated. When she expressed her unease with these practices, the Division Controller was told that this direction was coming from "management."[26] EMSI employees also created a fake data file in June 2015 to recognize revenue on a project that had not yet been approved by the client.

This was part of a greater pattern where, from June 2015 until the closing, EMSI employees would routinely recognize revenue on projects that the employees knew were not approved by clients. EMSI's Executive Vice President of the

_____

[26] Compl. ¶ 86.

Healthcare Division and the Division Controller also systematically increased completion percentages in the WIP model in August 2015 to inflate revenue and accounts receivable. When the Division Controller again expressed her view that the changes were "arbitrary and indefensible," the CFO responded that the changes were directed by management and would remain intact.[27] The Executive Vice President of the Healthcare Division was also alerted that the same project was included twice in EMSI's financial records in October 2015, leading to the recognition of over $500,000 in extra revenue, and yet he chose to do nothing to fix the error.

### E. The Parties Engage an Independent Auditor to Make a Net Working Capital Adjustment

After discovering the fraud and realizing that it had received substantially less than the $41 million in working capital it had bargained for, Plaintiff promptly initiated the so-called "net working capital adjustment process" that was laid out in Article II of the SPA. In that process, Defendants conceded that EMSI's net working capital was overstated by over $4 million in the interim financial statements and returned those funds to Plaintiff, but disputed Plaintiff's contention that another $5.8 million in accounts receivable identified in the Company's financial statements could not be justified under GAAP. To resolve that dispute, as mandated by the

---

[27] Compl. ¶ 115.

SPA, Plaintiff initiated a formal dispute resolution process with an auditor (the "Settlement Auditor") to determine the appropriate GAAP accounting. The Settlement Auditor agreed with Plaintiff and concluded that EMSI's financial statements overstated its accounts receivable by the $5.8 million claimed by Plaintiff in addition to the $4 million net capital overage that Defendants had conceded.

The aggregate purchase price adjustments made pursuant to the SPA totaled $9,894,520 (the voluntary adjustment of $4,085,379, plus the Settlement Auditor determination of $5,809,150), which exceeds the $9,562,500 placed in escrow. The Escrow Funds are gone.[28] Consequently, it is not disputed that if Plaintiff's claims in this action are subject to the contractual limitations set forth in the SPA, which would cap Plaintiff's recovery at the available Escrow Funds, then, as a practical matter, the claim is not viable.

## F. Procedural History

Plaintiff initiated this action to recover the shortfall in its recovery of the Settlement Auditor's net working capital determination by having this Court "confirm" the findings as an award under the Delaware Arbitration Act and also to "recover the inflated price it paid as a result of the Company's fraud" through the

---

[28] As the Joint Written Instruction makes clear, the only remaining funds held by the escrow agent after such disbursement would "constitute the Sales Tax Escrow Amount" (Ex. 4), which is a separate pool of money set aside solely for potential sales tax liabilities that is not available to satisfy any purchase price adjustment or indemnification obligation (*see* SPA § 1.4(a) & Art. XI).

15

indemnification provisions in the SPA.[29] Defendants promptly moved to dismiss the Complaint arguing that Plaintiff's recovery under the SPA was limited to the now-depleted Escrow Funds and that the Settlement Auditor's findings did not constitute a binding award that can be converted to a confirmed judgment under Delaware law.

## II. ANALYSIS

### A. Motion to Dismiss Standard

In considering this motion to dismiss for failure to state a claim under Rule 12(b)(6), the standard is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'[30]

Questions involving contract interpretation can be answered on a motion to dismiss "[w]hen the language of a contract is plain and unambiguous."[31] But dismissal of a contract dispute under Rule 12(b)(6) is proper "only if the defendants' interpretation is the only reasonable construction as a matter of law."[32] If the

---

[29] Pl.'s Br. in Opp. to Defs.' Mot. to Dismiss ("Answering Br.") 19.

[30] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[31] *Capital Corp. v. GC Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[32] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

Plaintiff has offered a reasonable construction of the contract, and that construction supports the claims asserted in the complaint, then the Court must deny the motion to dismiss even if the defendant's construction is also reasonable.[33]

## B. Plaintiff has Adequately Pled an Indemnification Claim Based on Fraud that Is Not Capped by the Escrow Funds

Defendants offer two grounds upon which the Court must dismiss Plaintiff's indemnification claim. First, they argue that the claim is subject to the limitation within the SPA that would cap any recovery at the amount of available Escrow Funds, which both sides acknowledge are now depleted. According to Defendants, Plaintiff's contrary construction of the SPA, which would allow any claim "based upon fraud" to proceed against the Sellers without regard to the contractual limits on recovery, cannot be squared with the clear and unambiguous language of the SPA. Second, Defendants maintain that even if Plaintiff's interpretation of the SPA is reasonable, the Complaint fails to plead fraud with particularity as required by Court of Chancery Rule 9(b). For reasons explained below, at this pleadings stage, neither ground is persuasive.

---

[33] *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.").

## 1. *Abry Partners V, L.P. v. F&W Acquisition LLC* and its Implications Here

Before I turn to the specifics of this case, it is appropriate to dilate for a moment on this court's seminal opinion in *Abry Partners V, L.P. v. F&W Acquisition LLC*, which Defendants claim served as a road map for the provisions they bargained for in the SPA.[34]  In *Abry*, a private equity firm purchased the shares of a publishing company from another private equity seller and thereafter sought rescission of the stock purchase agreement due to alleged fraud on the part of the company and the seller.[35]  This scenario served as a platform for the court to consider the state of the law in Delaware with respect to freedom of contract, risk allocation in transactions between sophisticated parties and the consequences of fraud in the sales process. Defendants are correct that these issues are front and center in this case.

The contract at issue in *Abry* contained a broad non-reliance clause.  Having agreed to this provision, the court was not tolerant of the buyer's claim that the seller had made false, extra-contractual promises upon which the buyer relied when it agreed to close the transaction.[36]  Under such circumstances, to allow the buyer to

---

[34] 891 A.2d 1032 (Del. Ch. 2006).

[35] *Id.* at 1035.

[36] *Id.* at 1059 (explaining that "[t]he integration clause must contain 'language that . . . can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract'").

pursue a fraud claim based on extra-contractual representations would be tantamount to condoning the buyer's fraud in representing in the contract that it had not relied upon any representations beyond those that appeared in the agreement.[37]

In addition to alleging extra-contractual fraud, the buyer in *Abry* also alleged that the seller and the company intentionally misrepresented facts in the contract. This contractual fraud, the buyer alleged, allowed it avoid the limitations in the agreement that precluded the buyer from pursuing rescission for breach of representations and warranties and capped damages for indemnification at $20 million, the amount placed in escrow to cover any post-closing claims of the buyer.[38] The seller disagreed and argued that the parties had agreed that the seller's risk for indemnification would be capped in all instances at the amount the seller had bargained for—$20 million.[39]

---

[37] *Id. See also id.* at 1035 ("Recognizing that the case law of this court gives effect to non-reliance provisions that disclaim reliance on extra-contractual representations, the Buyer has premised its rescission claim solely on the falsity of representations and warranties contained within the Stock Purchase Agreement itself."); *id.* at 1058 ("The enforcement of non-reliance clauses recognizes that parties with free will should say no rather than lie in a contract.").

[38] *Id.* at 1059.

[39] *Id.* at 1052 ("In summary, though, the [Seller's] argument proceeds as follows. The Stock Purchase Agreement is a carefully negotiated document that allocates economic risk. It was entered into by sophisticated parties in the private equity markets. In that Agreement, the parties carefully set forth which representations and warranties were made by the Company and which were made by the Seller. The Buyer also explicitly promised that the only information it relied upon in entering into the Agreement was that represented and warranted in the Agreement itself, thus contractually pledging that it had not relied on

After balancing Delaware's strong contractarian preferences against the well-settled public policy of this State that abhors fraud, the court concluded that, "to the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation of lies to the Buyer,"[40] the provision was void as a matter of law. Accordingly, the court declined to dismiss the buyer's claim of contractual fraud against the seller. But the court made clear that the claim survived because the buyer had pled facts that allowed a reasonable inference either that the seller knew that the representations and warranties made by the company were false or that the seller itself had made fraudulent representations and warranties.[41] In this regard, the court emphasized that the buyer could avoid the bargained-for limits on its remedies only if it could prove that the seller acted with an "illicit state of mind";[42] otherwise, if the buyer's proof revealed only that the company had misrepresented

___

extra-contractual representations. In addition, the Buyer agreed to the exclusive Remedy Provision stating that the only remedy that it had against the Seller for contractual misrepresentations was limited to a . . . Indemnity Claim. And, in that event, the Seller's liability is capped at the extent of the Indemnity Fund for $20 million. Furthermore, the Agreement explicitly indicated that the Exclusive Remedy Provision and limitation on liability contained in the contract were bargained for and reflected in the sale price.").

[40] *Id.* at 1064. *See also id.* at 1059 (noting the "strong tradition in American law that holds that contracts may not insulate a party from damages or rescission resulting from the party's fraudulent conduct").

[41] *Id.* at 1064.

[42] *Id.*

facts without the seller's knowledge of the falsity, then the buyer would be limited

to the bargained-for indemnity claim and its associated limitations.[43]

### 2. The Parties Have Offered Reasonable Competing Interpretations of the SPA

*Abry* provides a solid analytical framework within which to analyze the

arguments of buyers and sellers who seek to exploit the risk allocation provisions of

their transactional agreements, bargained-for on a clear day but deployed in the

midst of post-closing controversy. As our courts have recognized, "[d]eal-related

indemnification provisions address 'post-closing risk allocation.'"[44] They serve the

laudable purpose of "mak[ing] the contractual structure feasible or more attractive

to the participants."[45] Parties can shift risks of loss in their indemnification schemes

as is appropriate and necessary to get the deal done, and can disclaim certain claims

and remedies as well.[46] But "Delaware's strong public policy against intentional

---

[43] *Id.* (stating that the buyer "has no moral justification for escaping its own voluntarily-accepted limits on its remedies against the Seller absent proof that the Seller itself acted in a consciously improper manner").

[44] *White v. Curo Texas Hldgs., LLC*, 2016 WL 6091692, at *11 (Del. Ch. Sept. 9, 2016).

[45] *Delphi Easter P'rs Ltd. v. Spectacular P'rs, Inc.*, 1993 WL 328079, at *2 (Del. Ch. Aug. 6, 1993).

[46] *Abry,* 891 A.2d at 1058.

fraud" will not permit a party to a contract to disclaim or eliminate a claim that it made "a knowingly false contractual representation."[47]

The SPA contains a non-reliance clause in Section 5.7, where Plaintiff specifically disclaimed any reliance on extra-contractual representations. As A*bry* reiterates, these types of non-reliance clauses will be upheld where the clause contains "language that . . . can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[48] Section 5.7 arguably fits that bill. Plaintiff is also bound by the SPA's separation of the representations and warranties of the Seller from those of the Company and by the language at the end of Article III which states clearly that the representations and warranties in that article are the only ones being made by the Seller. Given this scheme, it is not surprising that Plaintiff has not sought to stake its fraud claim

---

[47] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 136–37 (Del. Ch. 2009) (citing *Abry P'rs*, 891 A.2d at 1061–64).

[48] *Kronenberg v. Katz*, 872 A.2d 569, 593 (Del. Ch. 2004).

against the Sellers on extra-contractual ground.[49]   Under *Abry* and its progeny,[50] therefore, absent a contractual portal, the Plaintiff (Buyer) cannot reach the Defendants (Sellers) on an indemnification claim beyond the bargained-for limits (the Escrow Funds) unless Plaintiff can demonstrate that Defendants acted with an "illicit state of mind" or "knew that the Company's representations and warranties were false."[51]

Defendants maintain that they took pains when they negotiated the SPA to honor Delaware's public policy and the holding in *Abry* by preserving the parties' rights to bring "a non-contractual claim based on fraud" outside of the "strictures that apply to contractual indemnification claims."[52]   Specifically, consistent with *Abry*, the SPA, at Section 10.10(a), preserves claims for "fraud or willful or

---

[49] *See Abry P'rs*, 891 A.2d at 1057 (stating that "a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim").   I note that Article X may be read to allow extra-contractual claims for fraud notwithstanding the non-reliance clause.   Indeed, as discussed below, that is how Defendants interpret the parties' bargained-for indemnification scheme.   Plaintiff, of course, has not pursued an extra-contractual fraud claim here and one can only surmise that it made that strategic decision, at least in part, based upon its appreciation that the non-reliance clause would likely complicate the prosecution of that claim.

[50] *See e.g. Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLP*, 2014 WL 6703980, at *27 (Del. Ch. Nov. 26, 2014).

[51] *Abry*, 891 A.2d at 1064.

[52] Reply Br. of Defs. in Supp. Of their Mot. To Dismiss the Verified Compl. "Reply Br." at 2–3.

intentional misrepresentation" by the Sellers within and subject to the indemnification framework. Section 10.10(b) then makes clear that extra-contractual claims "based upon fraud" against the Sellers are not subject to the bargained-for limits on remedies for contractual indemnification.

According to Defendants, this scheme, consistent with Delaware law, "provides for 'two paths to recovery' for a purchaser alleging misrepresentations in connection with a stock purchase agreement: '(1) suing contractually and going through the indemnification provisions or (2) suing for fraud.'"[53] This is because, in Defendants' reading, *Abry* makes clear that "[i]f the Company's managers intentionally misrepresented facts to the Buyer without knowledge of falsity by the Seller, then the Buyer . . . must proceed with an Indemnity Claim *subject to the Indemnity Fund's liability cap*."[54] Thus, Defendants maintain that Plaintiff's only options for recovery are either to (1) seek indemnification for breaches of representations and warranties from the now-dissipated Escrow Funds, or (2) bring a claim for fraud against Defendants based on the Sellers' own fraudulent actions subject, of course, to this Court's heightened pleading standards for fraud.

---

[53] Reply Br. at 1 (citing *Anvil Hldg. Corp. v. Iron Acq. Co., Inc.*, 2013 WL 2249655, at *9 (Del. Ch. May 17, 2013)).

[54] *Abry P'rs*, 891 A.2d at 1064 (emphasis added).

Plaintiff disagrees and maintains that the parties took a step beyond *Abry* in Section 10.10(b), in order to "deal[] with the precise situation identified here," by allowing the Buyer, without limitation or restriction, "to recover any amounts in connection with any action or claim 'based upon fraud' in connection with the contemplated transaction."[55] Plaintiff contends that, in this respect, unlike in *Abry*, the SPA deliberately "allocated to Sellers the risk that the Company was knowingly misrepresenting itself when it entered into the SPA."[56] And since its indemnification claim is "based upon" the allegedly fraudulent misrepresentations in the representations and warranties by the Company, as opposed to merely innocent breaches of the SPA, Plaintiff argues that the claim is not subject to the limitations on recovery imposed by Section 10.4(b). This is so, Plaintiff maintains, even if it has not pled and cannot prove that the Sellers acted with scienter in connection with their own representations and warranties or knew that the Company's representations and warranties were false when made.

Contract construction, in this instance, is complicated by two competing "notwithstanding clauses"—one in Section 10.10(b) providing that "[n]otwithstanding anything in this Agreement to the contrary (including . . . any limitations on remedies or recoveries . . .) nothing in this Agreement (or elsewhere)

---

[55] Answering Br. at 2–3; SPA § 10.10(b).

[56] Answering Br. at 3.

shall limit or restrict . . . any Indemnified Party's rights or ability to maintain or recover *any* amounts in connection with *any action or claim* based upon fraud in connection with the transactions contemplated hereby"; and the other in Section 10.4(d) providing that "[n]otwithstanding anything to the contrary in this Agreement (including, without limitation, Section 10.2) . . . : (b) The Buyer Indemnified Parties shall not be entitled to indemnification under Section 10.2(a) for *any and all* Losses . . . in excess of . . . and exclusively from, any then-remaining Escrow Funds."[57] Generally, "[t]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."[58] This tenant of construction is less useful when the contract contains two apparently conflicting "notwithstanding" clauses, both of which, at first glance, appear to "override" the other.[59]

---

[57] SPA §§ 10.10(b) (emphasis added); 10.4(d) (emphasis added).

[58] *In re Estate of Crist*, 863 A.2d 255, 258 (Del. Ch. 2004), *aff'd*, 876 A.2d 602 (Del. 2005). *See also Medicis Pharm. Corp. v. Anacor Pharm., Inc.*, 2013 WL 4509652, at *8 n.46 (Del. Ch. Aug. 12, 2013) (citing *Cisneros v. Alpine Ridge Gp.*, 508 U.S. 10, 18 (1993) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafters intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.")).

[59] *Cf. Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

Defendants reconcile these apparently contradictory provisions by arguing that Section 10.10(b) only removes the limitations on liability for extra-contractual fraud claims.[60]  Under this construction, the limits imposed by Sections 10.2(a) and 10.4(d) still apply to the Plaintiff's claim for indemnification against the Sellers based on fraud by the Company to the extent the claim arises from misrepresentations within the contract.[61]  Plaintiff responds that Defendants' proffered construction renders the "notwithstanding" clause in Section 10.10(b) meaningless.  According to Plaintiff, the "specific 'notwithstanding' clause in Section 10.10(b), which expressly disclaims 'all limitations on remedies or recoveries,' must prevail over the general 'notwithstanding' clause in Section 10.4,

---

[60] This construction of 10.10(b) would also take the indemnification scheme beyond *Abry*, which held that the non-reliance clause in the stock purchase agreement at issue precluded the buyer from suing on extra-contractual representations, even if fraudulent.  *Abry*, 891 A.2d at 1059.

[61] Defendants also contend that Plaintiff's singular focus on Section 10.10(b) guts the parties' carefully negotiated indemnification regime and renders meaningless several provisions of the SPA, including Section 10.4(d)'s restriction of indemnification recoveries to "then-remaining escrow funds" and Section 10.10(a)'s recognition that extra-contractual fraud fits within the indemnification regime.  According to Defendants, Plaintiff's construction of the SPA would violate the settled canon of contract construction that requires the court to interpret contracts so as to not render a provision "meaningless or illusory." *Coughlan v. NXP B.V.*, 2011 WL 5299491, at *8 (Del. Ch. Nov. 4, 2011).

which is included in the preamble clause, and not specifically tied to the indemnification limits in Section 10.4(b)."[62]

At this juncture, I find that it is at least reasonable to view the competing "notwithstanding" clauses as conflicting and to interpret the "notwithstanding" clause in Section 10.10(b) as trumping the "notwithstanding" clause in Section 10.4.[63] Whether the parties intended the "notwithstanding" clause in Section 10.10(b) to go beyond *Abry* by removing limits on the Seller's liability for "any" claim "based upon fraud," including claims that the Company alone committed fraud in its contractual representations and warranties, cannot be gleaned as a matter of law from the four corners of the SPA.

To be sure, Defendant's construction of Sections 10.10(b) and 10.4(d) as a sensible allocation to the Buyer of the Seller's risk that the Company's employees and managers were not honest brokers might ultimately prevail as the most reasonable. But it is not the only reasonable construction allowed by these provisions. As Plaintiff notes, a reasonable construction of Section 10.10(b) is that it confirms, "[n]otwithstanding anything in this Agreement to the contrary,"

---

[62] Answering Br. 27 (citing *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1049 (Del Ch. 2014) ("[U]nder the rule of contract interpretation . . . specific provisions should prevail over general provisions.")).

[63] *See Schiepisi v. Roberts*, 974 N.Y.S.2d 446, 447 (N.Y. App. Div. 2013) (holding that under Delaware law dueling "notwithstanding" provisions in a contract created ambiguity and therefore denying summary judgment).

including "any limitations on remedies or recoveries," that Plaintiff's "rights or ability to maintain or recover" for "***any action*** or claim ***based upon*** fraud" shall not be "limited or restricted."[64] This very broad language, apparently deliberate in its placement, does not delineate between "contractual" and "extra-contractual" fraud claims, but rather reasonably can be read to reflect that the parties agreed that there would be no limitations on recovery from the Sellers for *any* action or claim based upon fraud.[65]

---

[64] SPA § 10.10(b) (emphasis added). *See Unified Indus., Inc.*, 929 F.Supp. at 950 (construing the phrase "claims involving fraud" as "contemplate[ing] a wider range of claims than those that actually allege a cause of action ***for*** fraud").

[65] *See Alley v. U.S. Dep't of Health & Human Servs.*, 590 F.3d 1195, 1207 (11th Cir. 2009) ("The adjective 'any' has an expansive meaning and refers to 'every' or 'all' of the subject that it is describing."). Delaware courts may look to dictionaries to aid in the search for plain meaning where contract terms are undefined. *Northwestern Nat. Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del. 1996). Merriam-Webster's Collegiate Dictionary has defined "any" as "one or some indiscriminately of whatever kind," "one selected without restriction," "one, some, or all indiscriminately of whatever quantity," and "unmeasured or unlimited in amount, number, or extent." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 53 (10th ed. 1996). *See also U.S. v. Unified Indus., Inc.*, 929 F.Supp. 947, 950–51 (E.D. Va. 1996) ("The more plausible plain meaning of the phase 'involving fraud' is that it contemplates a wider range of claims than those that actually allege a cause of action for fraud. Had Congress intended to limit the [relevant statute's] exception to causes of action for fraud, the statute presumably would have so provided explicitly, by referring specifically to claims 'of fraud' or 'for fraud.' Instead, Congress chose to use the more general phrase, 'any claim involving fraud.' The use of this broader language reflects a congressional intent to except from [the statute] exclusivity not only causes of action for fraud in particular, but also actions the factual bases of which are intertwined with allegations of fraud.").

"Dismissal, pursuant to Rule 12(b)(6) is proper only if the defendants' interpretation is the only reasonable construction as a matter of law."[66] As Buyer's construction of Section 10.10 is reasonable, and may or may not prove to be most reasonable, the Motion must be denied. "[I]nelegant drafting" has left the Court unable definitively to construe the indemnification provisions of the SPA in a manner that would enable final adjudication of this dispute at the pleading stage.[67] The Court will require extrinsic evidence to construe the ambiguous indemnification provisions within Article X before determining which of the competing interpretations reflects the parties' intent with respect to indemnification for claims of fraud against the Seller arising from misrepresentations by the Company.[68]

---

[66] *See VLIW Tech.*, 840 A.2d at 615.

[67] *Stockman v. Heartland Indus. P'rs, LP*, 2009 WL 2096213, at *9 (Del. Ch. July 14, 2009) (noting that "inelegant drafting" had given rise to a dispute regarding the meaning of indemnification provisions within a partnership agreement).

[68] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (stating that where a contract is susceptible to multiple reasonable interpretations there is ambiguity, which then requires the reviewing court to consider extrinsic evidence in order to construe those ambiguous contract provisions).

### 3. Plaintiff has Adequately Pled Fraud by the Company

Defendant contends that even if the SPA allows Plaintiff to seek indemnification without any caps based on fraudulent misrepresentations by the Company, Plaintiff has not pled fraud against the Company with the requisite particularity. To state a claim for fraud, a plaintiff must

> plead facts supporting a reasonable inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.[69]

Court of Chancery Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Against this heightened pleading standard, to state a claim for fraud, a complaint must contain allegations of "the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the representation and what he obtained thereby."[70] And while Rule 9(b) allows a plaintiff to plead knowledge generally, a plaintiff "must allege sufficient facts from

---

[69] *Abry*, 891 A.2d at 1050.

[70] *Metro Commc'n Corp., BVI, v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004) (citation omitted).

which it can reasonably be inferred that [whatever the defendant is alleged to have known] was knowable and that the defendants were in a position to know it."[71]

When a plaintiff alleges that fraudulent statements appear in a contract, the pleading burden is easily satisfied for elements other than knowledge for the simple reason that

> The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract. Having pointed to the representations, the plaintiff need only allege facts sufficient to support a reasonable inference that the representations were knowingly false.[72]

Defendants assert that Plaintiff has not adequately pled the Company's knowledge of the fraudulent statements and that, in any event, Plaintiff has not adequately pled that certain of the alleged misrepresentations were ever made. I disagree.

### a. Plaintiff has Adequately Pled the Company's Knowledge

Defendants argue first that the Complaint does not adequately allege that the Company acted with knowledge when it made the false representations in the SPA regarding the Company's WIP model and the accuracy of the Company's financial statements "because Plaintiff has not tied any knowledge of wrongdoing to the

---

[71] *Abry*, 891 A.2d at 1050.

[72] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015).

corporate agents responsible for making the Company's representations."[73]  They

argue that the Complaint only contains allegations of lower-level employees

engaging in fraudulent accounting practices and that unidentified senior-level

employees may have acted with knowledge of the wrongdoing.

To reiterate, Delaware law is that a plaintiff adequately pleads knowledge in

the context of fraud when he pleads facts that allow a reasonable inference that the

false representation was "knowable and [] the defendants were in a position to know

it."[74]  Nevertheless, Defendants urge this court to take guidance from federal

securities fraud cases and adopt a more searching pleading standard[75] that would

impose a "stringent rule for inferences involving scienter."[76]  Delaware has not

---

[73] Opening Br. of Defs. in Supp. of their Mot. to Dismiss the Verified Compl. ("Opening Br.") 23.

[74] *Abry*, 891 A.2d at 1050 (holding that the Plaintiff had adequately pled knowledge where the seller's employee had discussions with the buyer about the target company's EBITDA and was in close contact with management of the target company about the target's financials, placing him in a position to have knowledge of the falsity of the financial statements and with an obvious motive to engage in wrongdoing).

[75] *See* Opening Br. 24–25.  These federal securities fraud cases cited by the Defendants fall under the Private Securities Litigation Reform Act ("PSLRA"), which requires complaints to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In contrast, Delaware law and Court of Chancery Rule 9(b) only require that knowledge be "averred generally."

[76] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008).

adopted this more stringent pleading standard for common law fraud,[77] and I decline to do so here.

Under Delaware law, principles of agency law supply "the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."[78] More specifically, courts will impute the knowledge of corporate actors to its corporate employer "when the agent was acting within the scope of his authority."[79] Following this, for the Complaint adequately to plead that the Company had knowledge of the fraud, Plaintiff must simply plead that the Company's employees had knowledge of the fraud.[80]

---

[77] *See Snowstorm Acq. Corp. v. Tecumseh Prod. Co.*, 739 F.Supp. 2d 686, 708 (D. Del. 2010) ("In Delaware . . . a claim for common law fraud is not subject to the heightened pleading standards of the PSLRA . . .").

[78] *Teachers Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006). *See also Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal.").

[79] *Abry*, 891 A.2d at 1050 n.35 (citation omitted).

[80] *See Affordable Home Enters., Inc. v. Nelson*, 1994 WL 315227, at *3 (Del. Super. Ct. May 25, 1994) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputable to the principal. Similarly, knowledge of an employee is imputed to the employer. This imputation occurs even if the agent does not communicate this knowledge to the principal/employer."). *See also Aidinoff*, 900 A.2d at 671 n.23; *Alex. Brown*, 2005 WL 2130607, at *11.

Plaintiff readily meets this standard. As illustrated in the following chart, produced in Plaintiff's Answering Brief, the allegations in the Complaint that reveal Company knowledge of the alleged fraud—actual and imputed—are extensive.

| EMSI Employee | Knowledge Allegations |
|---|---|
| **Chief Financial Officer**, who reported to Defendants Brook and Davis | • Told the Division Controller for the Healthcare business not to ask questions when she was told by the Executive Vice President of Healthcare Operations to make arbitrary and objectively incorrect changes to the Company's WIP model because they were "management decisions" that must be followed. (Compl. ¶¶ 113, 115).<br>• Scolded EMSI's bankers when they scheduled a discussion about WIP, the very financial statement line item the Company was manipulating during the sale process, explaining that WIP should only be discussed in a "smaller group." (*Id.* ¶ 162). |
| **Controller** | • Explicitly directed the operations team to remove "stale" projects from WIP revenue on June 1, 2015 because he was "concerned about the future" if they were not removed. (*Id.* ¶ 75).<br>• But then agreed to allow those "stale projects," representing millions of dollars of revenue, to remain in the Company's financial statements for the next five months, including in the October 2015 Interim Financial Statements. (*Id.* ¶¶ 76, 160). |
| **Executive Vice President of Healthcare Operations** | • Learned the Company's August—October 2015 WIP models included duplicate entries, representing nearly $500,000 of revenue and earnings, for the exact same project, yet decided to leave the duplicate entries in the Company's October 2015 Interim Financial Statements. (*Id.* ¶¶ 140–142).<br>• Intentionally left stale revenue in the WIP model despite prior instructions from lower-level employees that it should be written off. (*Id.* ¶¶ 73–76). |

35

| EMSI Employee | Knowledge Allegations |
|---|---|
| **Division Controller of Healthcare Operations** | • Directed by EMSI's senior management, including the Executive Vice President of Healthcare Operations, to manipulate EMSI's financial records by deleting the WIP Milestone formulas and replacing those formulas with numbers that produced substantially higher revenue and earnings than would have been produced by the normal operation of the WIP formulas. (*Id*. ¶¶ 84–90).<br>• Met with the Executive Vice President of Healthcare Operations on the morning of September 5, 2015 and consciously and intentionally made arbitrary changes to the Company's WIP model (without any business justification) to increase the amount of revenue and earnings EMSI could report in the October 2015 Interim Financial statements. (*Id*. ¶ 112). |
| **Chief Sales Officer** | • Solicited a file from a customer after he was told to "swear in blood" to that customer that the Company would not work on it—and then proceeded to recognize revenue on the project. (*Id.* ¶ 117) |
| **Defendant Brook** (former Executive Vice President and President of EMSI's Healthcare Services division) | • Developed the WIP Model, and thus was in the best position to know how it could be, and was being, manipulated by the Company. (Compl. ¶ 52).<br>• On several occasions, requested (or directed others to request) unapproved, preliminary files from clients on projects that the Company then included in revenue even though Defendant Brook knew the Company was not actually working on the project. (*Id*. ¶¶ 106–107, 116, 117).<br>• Emailed with the Executive Vice President of Healthcare Operations about creating two sets of books, one for internal and one for external (i.e., for Buyer) projections. (*Id*. ¶ 134). |
| **Defendant Davis** (former Chairman, President, and CEO of EMSI and signatory of the | • Agreed not to "ask many questions" if Brook could develop a plan to make up a $1 million budget shortfall less than a month into the sale process. (*Id*. ¶ 34).<br>• After seeing disappointing mid-month numbers for September 2015, told EMSI's Chief Operating Officer: |

| EMSI Employee | Knowledge Allegations |
|---|---|
| Company's representations in the SPA) | "We need the gp [gross profit] presented [to Buyer] last night." (*Id.* at ¶¶ 38, 137). The COO responded: "I know, that's why I'm in a bit of a panic. I'll figure something out." (*Id*.) Immediately after that, the Company turned to manipulating the WIP model, including by double booking revenue and income from the exact same project and loading projects into the Company's WIP model at volumes that were not just incorrect, but dramatically higher than the volume in EMSI's contemporaneous business records at the time. (*Id.* ¶¶ 139–144). <br>• After extensive manipulations of the WIP model in the prior months, told Defendant Rob Brook how to spin the Company's growing WIP balance to Buyer, by claiming that the "shortfalls will be made up." (*Id.* at ¶ 156–157). <br>• Tightly controlled due diligence, prohibiting any employee from discussing WIP. (*Id.* ¶¶ 161–62) |

These allegations meet Delaware standards for pleading knowledge as a basis for fraud in that they allow a reasonable inference the alleged fraud was knowable and that senior members of the Company's management involved in the sales process, including Defendants Brook and Davis, were in a position to know it.[81]

---

[81] *See Aviation W. Charters, LLC v. Freer*, 2015 WL 5138285, at *7 (Del. Super. Ct. July 2, 2015) (holding that, in a case alleging fraudulent accounting practices in connection with an acquisition, the complaint satisfied the knowledge requirement under Rule 9(b) for the claim that the buyers were fraudulently induced to enter into the acquisition because the complaint reasonably inferred that "'something' was knowable and that the defendant[s] [were] in a position to know it" by alleging that the defendants knew that some of the financials were inflated, that the defendants, by manipulating the financial statements, knowingly concealed the true financial condition of the company and that they also knew of the falsity of the EBITDA representations due to the company's revenue recognition practices) (quoting *Metro Communc'n*, 854 A.2d at 147).

## b. Plaintiff has Adequately Pled the Misrepresentations

Defendant also argues that Plaintiff has failed adequately to plead the falsity of the representations listed in Complaint at paragraphs 192 (iii), (v), (vi), and (vii).[82] First, Defendants argue that the Complaint does not adequately allege that the "Company falsely represented that it had not 'entered into any agreements' to change the Company's business practices or accounting methods between March 31, 2015 and Closing."[83] In this regard, Defendants contend that the Complaint does not allege that the Company had entered into any formal agreement to change business practices or accounting methods. While this might be true, the Company represented that it had not "entered into *any* agreements" to change its business practices and accounting methods and the Complaint pleads facts that support a reasonable inference that the Company's employees entered into an agreement, albeit not a "formal agreement," to modify the Company's business and accounting practices with regard to its WIP model by alleging that managers, in concert, engaged in systematic manipulations of that model to misstate Company revenue.[84]

---

[82] Defendants appear to have conceded that Plaintiff has adequately pled the misrepresentations set forth in paragraphs 192 (i), (ii), (iv), and (viii) of the Complaint. As stated earlier, the alleged misrepresentations in the SPA identified in the Complaint were made by the Company, not the Sellers.

[83] Opening Br. 31 (quoting Compl. ¶ 192(v)).

[84] *See generally* Compl. ¶¶ 69–160 (describing the process through which EMSI systematically manipulated the WIP Model from May to October 2015). *See also* Compl. ¶¶ 71–76 ("In an attempt to narrow its miss to budget [in May 2015], EMSI turned to the

Next, Defendants argue that the Complaint fails to plead facts to support an

inference that the Company fraudulently misrepresented that it had not accelerated

---

WIP Model. Specifically, . . . EMSI decided to not write-off over $1 million of WIP revenue on projects it identified as completed in May 2015. . . . Remarkably, EMSI rejected Ms. Brook's changes [where she had written off certain projects from the WIP]. It reinserted the Stale Projects and the corresponding over $1 million of WIP revenue back into the May WIP Model. . . . Despite the Controller's concerns [that certain projects should not be in the WIP], the Stale Projects Ms. Brook identified remained in the WIP Model for May 2015, artificially increasing EMSI's revenue and EBITDA for the month by well over $1 million."); ¶¶ 80–82 ("June 2015 started even worse than May 2015. When EMSI issued its Mid-Month revenue estimate on June 16, 2015, it estimated a $1.6 million miss to its forecast, including a $1.7 million miss in the Healthcare business. Davis asked Brook: 'Is there anything that can turn this to a more positive outcome for June?' In response, EMSI again turned to manipulating the WIP Model to close the Mid-Month gap. EMSI began to panic . . . when its client did not send the final [approval for a large project] by late June. Instead of simply waiting to recognize revenue until it actually received the final, approved TCL the following month, EMSI's operations team directed a member of EMSI's IT department to create a 'fake' list of medical records . . . so that it could load the project into its IT systems and begin recognizing WIP revenue."); ¶¶ 84–86 ("[I]n June 2015, EMSI manually overrode the WIP Milestone formulas in the WIP Model by manually advancing a number of projects to a later Milestone in order to recognize a greater percentage of WIP revenue. . . . The Division Controller was directed to manually override the WIP Milestone formulas by her superiors after she had repeatedly voiced her doubts about the propriety of it. The Division Controller was told repeatedly that the decision to override the WIP Milestone formulas was a 'management decision.'"); ¶ 95 ("To limit the budget shortfall in July 2015, EMSI again turned to manipulating the WIP Model."); ¶¶ 109–110 ("August 2015 followed the same pattern as May, June, and July. . . . To narrow the budget shortfall in August 2015, EMSI again turned up the volume of its financial manipulation."); ¶¶ 136–138 ("When EMSI issued its Mid-Month estimated revenue on September 17, 2015, it estimated that it was $1.6 million behind its revenue budget for the month, including an $800,000 miss in Healthcare. . . . EMSI did not 'figure something out,' at least not in the sense of operational improvements, in September. Instead, it turned back to its now-familiar playbook of manipulating the WIP Model."); ¶ 149 ("[In October, with] the deal expected to close at the end of the month, EMSI understood that it needed to keep the house of card standing for at least one more month. Thus, after releasing the Mid-Month projecting another down month, EMSI again turned to its familiar pattern of manipulation in October in hopes of closing the gap to the budget.").

the collection of any accounts receivable, as alleged in Complaint Paragraph 192(iii), but rather only alleges that the Company accelerated recognition of revenue. The Complaint says otherwise.[85]

Defendants then argue that the Complaint does not adequately allege that the Company breached its "material adverse effect" representation through its overstatement of EBITDA by $4.6 million. While I acknowledge that the "material adverse effect" standard is high,[86] this court will find that a plaintiff has adequately pled a material adverse effect if the pled facts support a reasonable inference that the misrepresentations "could produce consequences that are materially adverse to the Company."[87] In the Complaint, Plaintiff alleges that the adverse consequences to the Company of the fraudulent practices are that "the Company has been forced to let go numerous employees, fire the auditors, scrap the WIP model, and deal with much tighter cash flow than anticipated, constraining its ability to grow the business and comply with its debt covenants."[88] Whether this will be borne out in discovery

---

[85] *See* Compl. ¶¶ 106, 111, 123, 133 (all alleging alleged intentional manipulation of accounts receivable).

[86] *See Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 738 (Del. Ch. 2008) ("Delaware courts have never found a material adverse effect to have occurred in the context of a merger agreement.").

[87] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *7–9 (Del. Ch. Nov. 19, 2013).

[88] Answering Br. 50 (citing Compl. ¶¶ 176–77).

remains to be seen, but the Complaint supports a pleading-stage inference that the Company intentionally misled the Buyer with respect to its material adverse effect representation.[89]

Lastly, Defendant argues that the Complaint does not contain allegations that the Company committed fraud with regard to its representation that "'true and complete' copies of its interim financial statements for the period ended September 30, 2015 were attached to the SPA."[90] Not so. The theme that runs throughout the Complaint is that the Company misrepresented its financial fitness both in its financial statements and otherwise. Moreover, the Complaint alleges specifically that the interim financial statements reported $10.4 million in EBITDA for the twelve-month period ending September 30, 2015, but "$4.6 million of that EBITDA was fake, attributed only to EMSI's financial manipulations in the year prior to closing."[91] This is adequate to support a reasonable inference that the copies

---

[89] *See Osram*, 2013 WL 6199554, at *7–9 (holding that the Complaint stated a pleading-stage inference that the material adverse effect representation in the relevant purchase agreement had been breached where the acquired company "had made only half of its forecasted sales in Third Quarter 2011, and therefore had achieved $2 million less in revenues, reasonably could be interpreted as reflecting a change in circumstances that was 'materially adverse to the Business, . . . results[, and] operations of the Acquired Companies'").

[90] Opening Br. 31.

[91] Compl. ¶ 178.

of the Interim Financial Statements supplied to the Buyer were not the Company's "true and complete" financial statements.

*************

Having found that Plaintiff has adequately pled the Company's knowledge and the fraudulent misrepresentations in the SPA, the rest of the elements of the claim for fraud are easily satisfied.[92] It is reasonably conceivable that the Defendants intended that Plaintiff would rely on the misrepresentations since they were included in the SPA. Plaintiff has alleged causally related harm because it would not have purchased, or would have paid materially less to purchase, EMSI but for these allegedly fraudulent misrepresentations.[93]

### C. Plaintiff has Failed to Plead a Claim for Confirmation of the Auditor's Award

In the second count of the Complaint, Plaintiff seeks confirmation of the findings of the Settlement Auditor pursuant to 10 *Del. C.* §§ 5701 and 5713, and the entry of judgment for the amount of the award that has not been satisfied through the Escrow Funds. Defendants riposte that the Settlement Auditor's decision is not an arbitration award that can be confirmed by this court as that would contradict the explicitly bargained-for language found in the SPA. I agree.

---

[92] *See Prairie Capital*, 132 A.3d at 62.

[93] Compl. ¶¶ 164–73.

As noted, the parties' relationship is governed by the terms of the SPA, pursuant to which the Settlement Auditor undertook its work on behalf of the parties. The SPA provided that the Settlement Auditor would resolve any disputes regarding the calculation of net working capital at closing, which would then affect the ultimate purchase price. The Settlement Auditor did its work and found that financial statements delivered to Plaintiff at the closing of the transaction were not in compliance with GAAP and that adjustments totaling $9.8 million were required.

While Delaware law favors private arbitration of disputes,[94] that does not negate the requirement that a "contract must reflect that the parties clearly and intentionally bargained for whether and how to arbitrate."[95] Therefore, parties "cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement."[96] Here, the SPA explicitly provides that the Settlement Auditor will resolve disputes over the calculation Net Working Capital "acting as an expert and not an arbitrator."[97] If I were to interpret the Settlement Auditor's decision as an arbitration award, I would violate two of the cardinal principles of contract construction: terms within a contract must be afforded

---

[94] *DMS Props.-First, Inc. v. P.W. Scott Assocs., Inc.*, 748 A.2d 389, 391 (Del. 2000).

[95] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010).

[96] *DMS Props.-First*, 748 A.2d at 391.

[97] SPA § 2.3(b).

their plain meaning and any such plain terms should not be read to render other provisions meaningless.[98] While Plaintiff is correct that in certain instances an "expert's" decision in a dispute resolution proceeding,[99] or the parties' course of conduct during a dispute resolution proceeding,[100] may be tantamount to an arbitration, that cannot be the case where the contract language on point expressly states that the auditor/expert is *not* acting as an arbitrator. Therefore, in keeping with the plain meaning of the SPA, the Settlement Auditor's determination clearly is not an arbitration award that can be confirmed under 10 *Del. C.* §§ 5701 and 5713. Count II of the Complaint must be dismissed.[101]

---

[98] *See BLGH Hldgs. LLC v. enXco LFG Hldg., LLC*, 41 A.3d 410, 414 (Del. 2012) ("Where . . . the plain language of a contract is unambiguous *i.e.*, fairly or reasonably susceptible to only one interpretation, we construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions."); *Osborn*, 991 A.3d at 1159 ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage. We will not read a contract to render a provision or term meaningless or illusory.") (internal quotation marks and citations omitted).

[99] *See SRG Global, Inc. v. Robert Family Hldgs., Inc.*, 2010 WL 4880654, at *5 (Del. Ch. Nov. 30, 2010).

[100] *See Mehiel v. Solo Cup Co.*, 2007 WL 901637, at *3 (Del. Super. Ct. Mar. 26, 2007).

[101] This determination should not be construed as an opinion regarding binding effect of the Settlement Auditor's decision or whether the cap on payment from the Escrow Funds applies to the Settlement Auditor's decision. Those questions were not called by the Motion.

## III.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Verified Complaint is DENIED as to Count I and GRANTED as to Count II.

**IT IS SO ORDERED.**